UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re *Ex Parte* Application of STATE CORPORATION DEPOSIT INSURANCE AGENCY on behalf of INTERNATIONAL BANK OF ST. PETERSBURG for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782.

Case No. 21 Misc. _____

---

### *EX PARTE* PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

1. Petitioner, State Corporation Deposit Insurance Agency on behalf of International Bank of St. Petersburg ("Petitioner" or "DIA"), respectfully asks this Court to grant the Order attached as Exhibit A to the Declaration of O. Andrew F. Wilson, dated November 1, 2021 ("Wilson Declaration"), which grants Petitioner leave, pursuant to 28 U.S.C. § 1782 and Rules 26 and 45 of the Federal Rules of Civil Procedure, to serve Standard Chartered Bank, USA, 1395 Avenue of the Americas, New York, NY 10036 ("SCB") with the subpoena attached as Exhibit B to the Wilson Declaration.

2. The requested relief is necessary for the purpose of obtaining limited, but important, discovery in connection with anticipated proceedings in Russia (the "Foreign Proceedings"). The Foreign Proceedings will be brought by Petitioner in its capacity as official receiver of the JSC International Bank of St. Petersburg ("IBSP") against Sergei Bazhanov (the former Chairman of the Management Board and majority shareholder of IBSP), Alexander Zuev (a former member of IBSP's Board of Directors and Bazhanov's brother-in-law), and Hervet Investments Limited ("Hervet"), a minority shareholder of IBSP. The Foreign Proceedings will seek damages resulting from a series of fraudulent transactions executed by and among Bazhanov, Zuev, and Hervet.

3.  Based upon the Declaration of German Shubin, dated October 29, 2021 ("Shubin Decl."), attached as Exhibit D to the Wilson Declaration, and the accompanying Memorandum of Law in support of this Application, the Court should grant this Application *ex parte*.

4.  As set forth in more detail below and in the accompanying Memorandum of Law, Petitioner seeks documents from SCB for use in the Foreign Proceedings. Petitioner believes that the documents sought will further the Foreign Proceedings by allowing Petitioner to trace and recover IBSP's assets from Bazhanov, Zuev, and Hervet, and to discover who profited from the fraudulent transfers to the detriment of IBSP's creditors.

5.  Although Petitioner requests *ex parte* relief, Petitioner does not request that this matter be sealed by the Court.

**A. Background**

6.  Petitioner DIA is a Russian state corporation that protects the interests of banks, depositors, and other creditors, and that generally enhances confidence in the Russian bank system. Shubin Decl. ¶ 5.

7.  Under the laws of the Russian Federation, the DIA also acts as the official receiver of bankrupt banks, if such banks had a license to accept deposits from individuals. *Id.*

8.  IBSP, a bank duly incorporated under the laws of the Russian Federation, was recently declared bankrupt and insolvent. *Id.* ¶ 6.

9.  Prior to the bankruptcy proceedings, IBSP was ranked at the top of the second hundred Russian banks in terms of assets and in the first hundred Russian banks in terms of amount of funds deposited by individuals. *Id.*

10. Sergei Bazhanov was the Chairman of the Management Board of IBSP (essentially, the CEO of IBSP) and also a majority shareholder with a 92.28% stake in the bank. *Id.* ¶ 7.

11. One of IBSP's other shareholders is Hervet, a company incorporated under the laws of the Republic of Cyprus. *Id.* Hervet was a minority shareholder of IBSP since 2017; its stake was 0.77%. *Id.*

***The Dissipation of Assets by the Beneficiaries of IBSP***

12. In August 2018, the Central Bank of Russia ("CBR") conducted an unscheduled audit of IBSP. *Id.* ¶ 8.

13. As a result of the audit, on October 15, 2018, the CBR appointed the DIA as provisional administrator of IBSP, pursuant to the Russian Law on Bankruptcy ("Bankruptcy Law"). *Id.* The authority of IBSP's management was immediately suspended, and the CBR introduced a moratorium on creditors' claims. *Id.*

14. Also on October 15, 2018, the CBR published a press release on its official website about this event. *Id.* ¶ 9. In the press release, the CBR pointed out that the DIA had been appointed as provisional administrator due to the "unstable financial state [of IBSP]" and the "existence of a threat to interests of [IBSP's] creditors and depositors." *Id.*

15. On October 31, 2018, the CBR withdrew the banking license of IBSP and appointed provisional administrators to manage IBSP until the bank entered official receivership or liquidation. *Id.* ¶ 10. The provisional administrators made an assessment of IBSP's financial state and discovered signs of IBSP's insolvency. *Id.* ¶ 11. A report prepared for the CBR stated that IBSP's obligations to its creditors were RUB 23,879,182,000 (around USD 363 million) and its assets were RUB 10,845,064,000 (around USD 165 million). *Id.*

16. On November 19, 2018, the Arbitrazh (Commercial) Court of Saint-Petersburg and the Leningrad Region accepted an application of the CBR to declare IBSP bankrupt. *Id.* ¶ 12.

17. On September 24, 2019, the same court declared IBSP bankrupt (the reasoned decision was executed on October 3, 2019). *Id.* The DIA was appointed as official receiver, and the bankruptcy proceedings are still ongoing. *Id.*

18. On October 22, 2019, an English-language press release on the CBR website reported that, in the course of their investigation of IBSP, the CBR provisional administrators had "established that the bank's officials had conducted operations which suggest the intention to divert assets through lending to legal entities (including those associated with the bank) incapable of meeting their obligations and through disposal of the Bank's property." *Id.* ¶ 13.

19. The CBR investigation also established that Hervet actively participated in the dissipation of IBSP's assets. *Id.* ¶ 14. Hervet is an offshore company, incorporated in Cyprus, which has not provided its financial statements to Cypriot authorities over the past few years. *Id.* Hervet must have been aware of IBSP's pre-bankruptcy state, because, as described below, less than two months before the withdrawal of IBSP's license, Hervet withdrew its IBSP funds. *Id.*

20. In their report, the provisional administrators described and relied upon several suspicious transactions involving Hervet. *See id.* ¶ 15. These transactions can be divided into three groups. *Id.* ¶¶ 15-22.

21. The first group of suspicious transactions includes substantially similar sale-purchase agreements of credit linked notes ("CLN") entered into by IBSP and Riverrock Securities Limited ("RSL"), a company incorporated under the laws of the United Kingdom. *Id.* ¶ 16. The transactions were structured as follows: throughout 2018 RSL extended several loans to Hervet; RSL then sold the loans to UBS AG (London Branch) ("UBS"); UBS subsequently

issued and sold CLNs back to RSL, which included the RSL-Hervet loans as a base asset; finally RSL sold those CLNs to IBSP for approximately USD 140 million. *Id.*

22. At the time IBSP bought the Hervet-loan backed CLNs, IBSP knew or should have known that Hervet did not have sufficient assets to repay the loans. If IBSP had evaluated Hervet's assets before it purchased the CLNs from RSL, it would have been obvious that Hervet was under-capitalized and could not repay the loans underlying the CLNs. *Id.* ¶ 17.

23. Shortly after the revocation of IBSP's license, Hervet stopped paying the interest due to UBS on the loans, triggering a default event. *Id*. Also, in a letter dated December 11, 2018—only five months after IBSP made its final purchase of a Hervet-backed CLN—Hervet informed IBSP that it was "unable to pay its debts as they fall due to the Bank," under some other agreements. *Id*.

24. As a result of this scheme and due to features of CLN regulation, IBSP acquired rights to claim repayment of the loans granted to Hervet, but because the principal due on the loans is far greater than Hervet's assets, the scheme has led to significant losses for IBSP. *Id.*

25. The second group of suspicious transactions are those connected with the issuance of letters of credit. *Id.* ¶ 18. IBSP executed several letters of credit issuance agreements ("LC Issuance Agreements") with four Swiss companies. *Id.* These Swiss companies, prior to the execution of the agreements, entered into soybean sale contracts with Hervet. *Id.* The letters of credit were means of payment to commodity companies from which the Swiss companies had purchased those soybeans for Hervet. *Id.* Shortly after execution of the LC Issuance Agreements, IBSP and the Swiss companies executed discharge agreements pursuant to which IBSP acquired rights to receive payment from Hervet to the Swiss companies under the sale contracts and

simultaneously acknowledged that the Swiss companies' obligations under the LC Issuance Agreements had been discharged. *Id.*

26. Thus, IBSP, in lieu of rights to receive payment from large and financially stable companies, received worthless claims on paper against Hervet, causing IBSP about $83 million in losses. *Id*.

27. The third group of suspicious transactions comprises assignment agreements related to liquid indebtedness. *Id.* ¶ 19. IBSP issued two letters of credit for a total of about $30 million in favor of Simec Group Limited, a company incorporated under the laws of Hong Kong. *Id.* IBSP then executed an assignment agreement with Hervet, pursuant to which Hervet acquired rights to claim repayments from Simec Group Limited. *Id.* At the same time, the purchase price for these rights did not become due until July 2025. *Id.* Such a long term for payment of the price is a strong indicator of the parties' intention to dissipate liquid assets. *Id.*

28. As a result of this transaction, IBSP again acquired a worthless claim on paper against Hervet. *Id.*

29. A similar scheme was performed in relation to the indebtedness of Group Rich Enterprises Limited ("Group Rich"), a company incorporated under the laws of Hong Kong. *Id.* ¶ 20. A loan agreement was executed between IBSP and Group Rich. *Id.* Just over one year after the execution of this agreement, IBSP executed an assignment agreement with Hervet. *Id.* According to this assignment agreement, Hervet acquired the right to claim USD 7 million from Group Rich. *Id.* However, Hervet has not paid any money due under this agreement to IBSP, because there is no payment due until July 2025. *Id.*

30. Once again, IBSP, in lieu of its claim to Group Rich, obtained a claim to Hervet with an unreasonably long deferral of payment**.** *Id.*

31. All the above-mentioned transactions are now being challenged by the DIA on the basis of specific provisions of the Bankruptcy Law, but no final decisions have been rendered thus far. *Id.* ¶ 21.

32. Hervet executed four deposit agreements with IBSP and opened relevant accounts with the bank into which it deposited funds. *Id.* ¶ 22. From September 17, 2018 to September 28, 2018, funds initially deposited by Hervet in these accounts were transferred back to its accounts with Raiffeisen Bank International AG ("Raiffeisen"). *Id.*

33. SCB is Raiffeisen's correspondent bank for transactions executed in U.S. dollars. *Id.* ¶ 38.

34. On October 18, 2019, the DIA filed a complaint with the Arbitrazh (Commercial) Court of Saint-Petersburg and the Leningrad region in an attempt to declare void any payments made by IBSP to Hervet under the deposit agreements. *Id.* ¶ 22. The total amount of money transferred back to Hervet was around RUB 1.1 billion (around USD 16.7 million). *Id.* Hervet withdrew its IBSP deposits less than two months before the CBR withdrew IBSP's license, which was to the detriment of other creditors of IBSP because these transfers were performed with unfair preference, contrary to provisions of the Bankruptcy Law. *Id.*

35. As described above, the suspicious transactions involving Hervet led to substantial dissipation of IBSP's assets—totaling about $276 million in damages—to the detriment of IBSP creditors' rights. *Id.* ¶ 23. In the meantime, the difference between IBSP's total liabilities and the value of its assets pursuant to the initial assessment of the DIA amounted to less than $200 million. *Id.*

36. Notably, Hervet is not only a minority shareholder of IBSP, but it is also affiliated with its management. *Id.* ¶ 24.

37. On June 18, 2018, Bazhanov sent a letter to Louis Dreyfus Suisse SA, in which he confirmed that Hervet was under the ultimate control of IBSP. *Id.* He also confirmed that Alexander Zuev—who is Bazhanov's brother-in-law—was a direct owner of Hervet, acting for and on behalf of IBSP. *Id.*

38. Zuev also had been a member of IBSP's Board of Directors for approximately 15 years. *Id.* ¶ 25. Zuev's sister (Bazhanov's wife) was the Chairman of IBSP's Board of Directors, and Bazhanov was another member of the Board of Directors. *Id*. This nepotism further supports the fraudulent nature of the above-described transactions. *Id.*

39. In late 2019, criminal charges were filed against Bazhanov for his role in these transactions, alleging falsification of financial statements of a financial organization. *Id.* ¶ 26.

40. In anticipation of the criminal case against him, Bazhanov is believed to have fled to either England or France, where he apparently remains. *Id.*

***The Anticipated Proceedings Against Bazhanov, Zuev, and Hervet***

41. The DIA, as official receiver of IBSP, anticipates commencing legal proceedings in Russia against Hervet, Bazhanov, and Zuev to hold them jointly and separately liable for damages caused by the above-described fraudulent transactions to depositors and other creditors of IBSP. ¶ 27. The DIA now seeks discovery pursuant to 28 U.S.C. § 1782 for use in those anticipated proceedings. *Id.* ¶ 28.

42. Specifically, the DIA intends to bring proceedings under five provisions of Russian law. *Id.* ¶ 29.

43. First, Article 61.10(4) of the Bankruptcy Law provides that, unless proved otherwise, a person who benefits from unlawful and bad-faith conduct of persons is assumed to be authorized to act on behalf of the debtor, as a person controlling the debtor. *Id.* ¶ 29(a).

8

44. The Supreme Court of the Russian Federation has further clarified this provision and noted that a person who has received substantial profits, which would not have been received if the CEO of the debtor had acted in good faith, may be considered a person controlling the debtor. *Id.* The concept of persons controlling the debtor is quite broad under the Bankruptcy Law and may also include legal entities. *Id.*

45. Second, Article 10(4) of the Civil Code of the Russian Federation ("Civil Code") provides that if a person abusing his own rights violated rights of other persons, such persons can claim damages caused by the abuse of rights. *Id.* ¶ 29(b).

46. Third, Article 15(1) of the Civil Code provides that a person whose rights have been violated may claim damages caused in full, unless a law or a contract specifies otherwise. *Id.* ¶ 29(c).

47. Fourth, pursuant to Article 1064(1) of the Civil Code, harm inflicted to property of an individual or legal entity by a tortfeasor must be recovered in full. *Id.* ¶ 29(d). This article provides for the so-called "principle of general delict," which means that any harm caused to another person shall be compensated. *Id.* This principle implies a broad scope of application and may be used in any case against any tortfeasor unless the tortfeasor proves that the harm caused was not due to his fault, or that his actions were lawful. *Id.*

48. Finally, pursuant to Articles 61.11(1) and 189.23(1) of the Bankruptcy Law, if payments to the creditors cannot be made in full due to actions or omissions of persons controlling the debtor, such persons shall bear subsidiary liability for the debtor's obligations. *Id.* ¶ 29(e).

49. In order for IBSP to prevail in these anticipated proceedings, it is important to establish who orchestrated Hervet's participation in the fraud and a full list of companies to

which the money that dissipated from IBSP was transferred. *Id.* ¶ 30. This list will help prove that the above-mentioned transactions were fraudulent and aimed at enrichment of the anticipated defendants. *Id.*

50. There could also be other, currently unknown beneficiaries of the suspicious transactions whose identities may be revealed through additional disclosures. *Id.* ¶ 31. If so, the DIA intends to bring proceedings against such beneficiaries. *Id.* For these purposes, the DIA now seeks targeted discovery pursuant to 28 U.S.C. § 1782. *Id.* ¶ 32.

**The Requested Discovery**

51. Petitioner seeks discovery of records concerning wire transfers sent or received by Hervet where SCB acted as the correspondent bank of Raiffeisen, to determine who orchestrated Hervet's participation in the fraud and to whom the profits from the suspicious transactions were distributed.

52. Hervet received payments under the suspicious transactions detailed above in U.S. dollars. *Id.* ¶ 38. Because Hervet executed these suspicious transactions in U.S. dollars, and SCB is Raiffeisen's correspondent bank for U.S. dollars transactions, it is highly likely that SCB will have documents concerning the transactions and the transfers of funds into Hervet's Raiffeisen account. *Id.*

53. Disclosures obtained following the DIA's successful § 1782 application in November 2020 bear this out. Included within the disclosures were spreadsheets containing information about a number of transactions in which Hervet and SCB participated.[1] *Id.* ¶ 39.

---

[1] Petitioner has not included these spreadsheets in this filing because they are subject to a Confidentiality Agreement and Protective Order entered by Judge Engelmayer. *See In re* Ex Parte *Application of State Corp. Deposit Ins. Agency on Behalf of Int'l Bank of St. Petersburg*, 20 Misc. 448 (S.D.N.Y.), Dkt. 7. Petitioner will provide the Court with these materials under seal if the Court believes it would be helpful to the adjudication of this application.

54. One spreadsheet contains twelve records of transactions in which Hervet is listed as the originator party and SCB is listed as the debiting bank. In nine of those twelve records, Louis Dreyfus Company Asia Pte Ltd ("LDC Asia") is listed as a final beneficiary. *Id.* ¶ 40. LDC Asia is one of the commodity companies from which Swiss companies purchased soybeans for Hervet. *Id.* ¶ 18. The total value of the transactions with LDC Asia is around USD 11.5 million. *Id.* ¶ 40. IBSP is also listed as a final beneficiary of three other transactions totaling USD 29.4 million. *Id.* There is one transaction in the spreadsheet in which LDC Asia is the originator party, SCB is the crediting bank, and Hervet is a final beneficiary. *Id.*

55. Another spreadsheet included in the disclosures contains two records of transactions in which Hervet is listed as the originator party and SCB is listed as the reimbursing bank. *Id.* ¶ 41. Bank Julius Baer Zurich is listed as a beneficiary under these transactions, which total around USD 10 million. *Id.*

56. Discovery from SCB will help the DIA prove who orchestrated Hervet's participation in the fraud and understand to whom Hervet was transferring money after its receipt through the suspicious transactions. This discovery is necessary to track the further movement of the funds and to help confirm the ultimate recipients or beneficiaries of these transactions. *Id.* ¶ 42.

57. Discovery from SCB can be used in the Foreign Proceedings the DIA will file. *Id.* ¶ 43.

58. Russian laws do not prohibit the acquisition or use in civil proceedings of bank records such as those sought here. *Id.* ¶ 44.

### B. Petitioner's Application Should Be Granted

59. Petitioner's proposed subpoenas contain one document request for:

> All Documents, including logs or spreadsheets, concerning all wire transfers between 2017 and the present sent or received by Hervet Investments Limited, including but not limited to transfers in which you acted as an intermediary bank or a correspondent bank to facilitate an interbank funds transfer.

60. Petitioner meets all the statutory criteria for the issuance of an order allowing the requested discovery under 28 U.S.C. § 1782. SCB is located in this district, and the Petitioner, the official receiver of IBSP, intends to commence legal proceedings in Russia to recover damages caused by the fraudulent transactions of Bazhanov, Zuev, and Hervet, and seeks to use the documents sought from SCB in those proceedings. The documents sought from SCB are relevant to identifying wrongdoers and the companies to which the money that was dissipated from IBSP was transferred.

61. Moreover, as set forth in the Memorandum of Law filed concurrently herewith, all the discretionary factors that this Court may consider likewise favor granting this *ex parte* application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004) (describing discretionary factors).

WHEREFORE, Petitioner respectfully requests that the Court:

(a) grant the *Ex Parte* Application for an Order to Conduct Discovery in a Foreign Proceeding;

(b) enter the Proposed Order attached to the Wilson Declaration as Exhibit A;

(c) grant Petitioner leave, pursuant to 28 U.S.C. § 1782, to serve the subpoena attached to the Wilson Declaration as Exhibit B; and

(d) grant any and all other further relief to Petitioner as deemed just and proper.

Dated: New York, New York
November 1, 2021

        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

By: _____/s/_____
    O. Andrew F. Wilson
    Samuel Shapiro

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Petitioner*

13